UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

ESTHER STEIN,

                        Plaintiff,

    v.

                                          Civ. No. 12-cv-04739 (JPO) (JLC)

GUARDSMARK, LLC, and
IRA A. LIPMAN, individually,

                        Defendants.
_____

**DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE PURSUANT TO LOCAL RULE OF CIVIL PROCEDURE 56.1**

                                              **HARRIS BEACH PLLC**

                                              Scott D. Piper
                                              Kyle W. Sturgess (admitted *pro hac vice*)
                                              *Attorneys for Defendants*
                                              99 Garnsey Road
                                              Pittsford, New York 14534
                                              Telephone: (585) 419-8800
                                              E-Mail: spiper@harrisbeach.com

HARRIS BEACH PLLC
ATTORNEYS AT LAW

**PRELIMINARY STATEMENT**

Defendants Guardsmark LLC and Ira. A. Lipman, individually, (hereinafter "Guardsmark" or the "Company," and "Mr. Lipman" respectively; collectively, the "Defendants"), pursuant to Rule 56 of the Rules of the United States District Court for the Southern District of New York and Local Rule 56.1, submit that there are no issues with respect to the following material facts. Defendants' Statement is premised upon the following evidentiary sources: (1) the Affidavits of Ramona Martin, Dr. Robert Overman, Gareth C. Leviton, Esq., and Jason Mayse, all sworn to on or about February 21, 2013; and (2) all of the other papers and Exhibits annexed hereto, all of which would at trial constitute evidence in admissible form (with respect to the purposes for which they are introduced here) pursuant to the Federal Rules of Evidence.

**THE PARTIES**

1. Headquartered in Memphis, Tennessee, Guardsmark is one of the largest privately-held private security firms in the United States, employing approximately 16,000 employees at any given time and generating revenues of nearly half a billion dollars in fiscal year 2011. Leviton Aff. at ¶2; Overman Aff. at ¶¶2-3. Guardsmark offers its clients a full range of security services including uniformed security services; facilities design consulting; background screening and investigation of employees and applicants; and all manner of corporate security including executive protection and cybersecurity. Guardsmark operates in over 400 cities across North America and in the United Kingdom. Id. at ¶3.

2. Mr. Lipman is the owner, President, and Chief Executive Officer of Guardsmark. Mr. Lipman founded the company in 1963 and it has remained under his control for the entirety of its existence. Leviton Aff. at ¶2; Overman Aff. at ¶2. Mr. Lipman is a hands-on, detail-oriented

executive who remains highly active in the management of his sprawling, international company. Overman Aff. at ¶¶2, 13.

3. Plaintiff was formerly employed by Guardsmark as the Secretary to the President between June 18, 2008 and September 2, 2011, when her employment by the Company ceased, although the Plaintiff continued to receive health insurance coverage through the end of September 2011. Martin Aff. at ¶¶3, 11-14; Leviton Aff. at ¶¶3, 8-10.

### PLAINTIFF'S RECRUITMENT AND HIRE

4. The Plaintiff was recruited to her position by a Guardsmark recruiter, Shea Kearney, and participated in multiple interviews—at least one with Kearney, and a group interview involving, *inter alia*, Dr. Robert Overman (Guardsmark's Director of Human Resources) and Joshua Lipman (Guardsmark's Senior Vice President, corporate Secretary and Assistant Treasurer)—en route to being offered her position. Overman Aff. at ¶¶6-8.

5. In at least one of these interviews, Dr. Overman discussed with the Plaintiff the facts that (1) she would be a salaried employee; and (2) the amount of her starting salary. Overman Aff. at ¶¶8, 11. The Plaintiff's anticipated hours of work were also explained to her (which, though variable, were expected to be more than forty hours per week on average). Id. at ¶8.

6. The terms of the Plaintiff's salary payment were reiterated to her in an offer letter dated June 17, 2008, that was signed and returned to the Company by the Plaintiff. (A copy of the offer letter sent the Plaintiff dated June 17, 2008, is annexed hereto as **Exhibit A**.)

7. That offer letter specified that the Plaintiff's "base salary will be at the rate of $110,000 per year, payable bi-weekly." Ex. A. (This amounted to a weekly salary of $2,115.38.)

**Plaintiff's Overtime Eligibility**

8.     The Plaintiff's offer letter did *not* specify that the Plaintiff was eligible for overtime—nor, indeed, state that the Plaintiff was "non-exempt" with respect to the Fair Labor Standards Act—but the Company, by its own choice and at its own discretion, followed a practice of compensating the Plaintiff via the "fluctuating work week" method of overtime payment for time she worked in excess of forty hours per week.  Martin Aff. at ¶7; Mayse Aff. at ¶¶4-12; Ex. A.

9.     Guardsmark's payroll department relies on the United States Department of Labor's ("DOL") regulations implementing the Fair Labor Standards Act, along with the DOL's Wage and Hour Division's Field Handbook and guidance from the Company's own legal department, for its understanding of how to properly apply the fluctuating work week method.  Mayse Aff. at ¶¶2-3, 8, 12.

10.     The method in question operates by dividing the weekly salary of each employee (to whom the method applies) by the number of hours the employee has worked in that week, to determine the "straight time" hourly rate for that week.  Mayse Aff. at ¶¶4-7.  The employer then multiplies the number of hours worked in excess of forty by half that hourly rate to determine the "overtime premium" due the employee.  Id.

11.     The Department of Labor's Wage and Hour Division has issued a "Coefficient Table for Computing Extra Half-Time for Overtime" that permits an employer to simplify the calculation of the fluctuating work week method's "overtime premium" by simply multiplying an employee's salary by the appropriate decimal coefficient based on the number of hours worked in that week. Mayse Aff. at ¶¶8-12.  (A copy of the most recent "Coefficient Table" as available to Guardsmark is annexed hereto as **Exhibit B**.)

12. The Plaintiff understood that she was being paid overtime, because she sent a series of emails to Guardsmark's payroll department asking about the subject with respect to her compensation, including one to Scott Thompson in the Company's payroll department as early as August 4, 2008. (A copy of an email conversation dated August 4 and 5, 2008 between the Plaintiff and Mr. Thompson, discussing overtime amounts paid to the Plaintiff, is annexed hereto as **Exhibit C.**)

13. In her August 4 email, the Plaintiff asked Mr. Thompson about the week-by-week breakdown of an overtime payment that she had recently received that included overtime compensation for more than one workweek. Ex. C. Mr. Thompson responded by showing the client how many overtime hours she had been paid for in each particular week. Id.

14. The Plaintiff also sent a question concerning overtime compensation to Jason Mayse, the Payroll Manager in Guardsmark's Human Resources department in or about July 2009. Mayse Aff. at ¶13.

15. The actual methodology of the Plaintiff's overtime calculation (i.e., a description of the "fluctuating work week" method's formula) was provided to the Plaintiff on this occasion via email, in response to her inquiry. Mayse Aff. at ¶13. (A copy of the email chain between the Plaintiff and Jason Mayse, dated between July 21 and 22, 2009, is annexed hereto as **Exhibit D.**)

16. On July 22, 2009, in response to a question from the Plaintiff about how to determine the "breakdown" of her overtime hours and gross pay, Mr. Mayse provided the Plaintiff with a clear and succinct explanation of how to apply the "fluctuating work week" method of overtime compensation:

> The [overtime] is calculated on a per week basis. To calculate your [overtime] for a particular week, divide your bi-weekly rate by 2 to get a weekly rate. Divide your weekly rate by the number of hours worked during the week in question to get a [sic] hourly rate. Divide the hourly rate by 2 to get a half-time rate. Multiply the half

> time rate by the number of hours worked during the week over 40. That total will be your [overtime] for the particular week.

Mayse Aff. at ¶13; Ex. D.

17. Aside from her questions seeking clarification of Guardsmark's overtime payment method, the Plaintiff never disputed to any individual at Guardsmark the way in which her overtime compensation was being computed, or otherwise objected to the payment of any overtime compensation as erroneous or insufficient. Mayse Aff. at ¶14; Martin Aff. at ¶10.

18. Indeed, the first indication the Company had that the Plaintiff had elected to take issue with her overtime compensation, was the receipt of a demand letter from the Plaintiff's attorney, nearly nine months after the Plaintiff had resigned her employment, and close to three years after the July 22, 2009 explanation that she received from Mr. Mayse. Leviton Aff. at ¶10.

**Payment of Plaintiff's Salary**

19. The Plaintiff recorded her work hours via hand-written timesheets that were submitted to the Company's finance and payroll department. Martin Aff. at ¶5. (Copies of selected handwritten time sheets submitted by the Plaintiff are annexed hereto as **Exhibit E.**) Prior to their submission and processing, the timesheets were authorized by signature from Mr. Lipman. Martin Aff. at ¶6; Mayse Aff. at ¶11.

20. Once the Plaintiff's timesheets were authorized, they were transmitted via interoffice mail to the Company's payroll office in Memphis, Tennessee. Mayse Aff. at ¶11; Martin Aff. at ¶6.

21. During the course of the Plaintiff's employment, all of her timesheets were ultimately submitted for processing. Martin Aff. at ¶5. Mr. Lipman never refused to authorize any of the Plaintiff's timesheets that were submitted to him for signature. Id. at ¶6.

22. When the timesheets were received by the Company's payroll department in Memphis, Guardsmark used the Department of Labor's above-described "Coefficient Table" to calculate the Plaintiff's "overtime premium" entitlement. Mayse Aff. at ¶¶11-12.

23. The resulting overtime premium was then paid out to the Plaintiff in the next available pay period. Mayse Aff. at ¶11. (A spreadsheet created by Guardsmark demonstrating the overtime payments made to the Plaintiff on a week-by-week basis is annexed hereto as **Exhibit F**.)

24. Guardsmark used the same method to calculate the Plaintiff's overtime entitlement throughout her entire tenure with the Company. Mayse Aff. at ¶12.

25. While these sheets were used to calculate her overtime payment for the week, the Plaintiff received her base salary of $2115.38 per week (or $4,230.76 per bi-weekly pay period) irrespective of how many or how few hours she worked in any week. Martin Aff. at ¶¶8-9. (Copies of payroll documents summarizing the Plaintiff's compensation on a weekly basis between 2008 and 2011 are annexed hereto as **Exhibit G.**)

26. The Plaintiff was able to observe the payment of her base salary on a bi-weekly basis from the "Earnings Statements" that she received for each pay period. (Copies of several such earnings statements, reflecting the Plaintiff's base salary, are annexed hereto as **Exhibit H.**) (These Earnings Statements also permitted the Plaintiff to see that she was being paid overtime compensation. Ex. H.)

27. By way of example, the Plaintiff did not work a forty-hour workweek during the workweek of January 17-22, 2011; however, the Plaintiff was still paid her full base salary during the bi-weekly pay period ending January 22, 2011. See Ex. E and G.

28. The Plaintiff earned a total of $59,975.08 during six months and twelve days of employment in calendar year 2008 ($54,483.54 before the inclusion of overtime pay); $126,504.85

through twelve months of employment in calendar year 2009 ($115,299.66 before the inclusion of overtime pay); $122,916.90 through twelve months of employment in calendar year 2010 ($110,068.66 before the inclusion of overtime pay); and $84,250.89 through approximately eight months of employment in calendar year 2011 ($77,402.92 before the inclusion of overtime pay). See generally Ex. G.

29. The overtime she received during this period represented all of the overtime to which the Plaintiff was entitled under the "fluctuating work week" method as applied by Guardsmark using the Department of Labor's guidance document. Mayse Aff. at ¶12; Ex. B.

### THE PLAINTIFF'S DUTIES AND RESPONSIBILITIES

30. As the Secretary to the President the Plaintiff was the primary assistant to Mr. Lipman and engaged in a multitude of tasks that facilitated Mr. Lipman's ability to manage his sprawling company with the hands-on style that is customary of his leadership. Overman Aff. at ¶¶2, 12-27. The Plaintiff herself generally characterized her tasks in her Complaint as "secretarial and…administrative duties." (A copy of the Plaintiff's Complaint is annexed hereto as **Exhibit I.**) Ex. I at ¶19.

31. These duties took place both at Mr. Lipman's office at his personal residence—where Mr. Lipman and the Plaintiff typically worked the first several hours of the workday—and at Guardsmark's offices at the Rockefeller Center in New York City, where Mr. Lipman's primary office is located. Overman Aff. at ¶12; Martin Aff. at ¶5. (A copy of a document, provided by the Plaintiff in discovery and detailing some of her duties, is annexed hereto as **Exhibit J.**)

32. Consistent with what the Plaintiff had been told about her hours at the time of her hire, her working hours per week varied considerably over the course of her employment. Overman Aff. at ¶¶8-9; Ex. E and F.

33. During most workweeks for which the Plaintiff submitted a timesheet, the number of hours recorded was between 40 and 60. Ex. E and F. However, in some instances the Plaintiff worked as much as 62 hours per week. Id.

34. These hours generally mirrored Mr. Lipman's own working hours at his residence and in the Rockefeller Center office: because Mr. Lipman works very long hours at the office and requires administrative support during that time (i.e., placing and receiving calls), it was accordingly necessary for the Plaintiff to stay at her position well into the evening. Overman Aff. at ¶¶8-9 and Ex. J.

35. Whatever the number of hours recorded on her timesheet in any given week in excess of forty, the Plaintiff was provided overtime compensation in accordance with the fluctuating work week method. Mayse Aff. at ¶¶10-12.

**Duties at the Residence**

36. The Plaintiff's duties at the residence including opening all of the correspondence that arrived there, sorting it into various categories, and presenting it to Mr. Lipman. Ex. J at PL0000013.

37. Such categorization and presentation required the Plaintiff to distinguish for Mr. Lipman which correspondence was urgent or required a response from him. The Plaintiff performed these duties on a daily basis. Ex. J at PL0000013 and PL0000022-25.

38. The Plaintiff's routine duties at Mr. Lipman's residence also included the updating of "inventory control sheets"—records maintained by Mr. Lipman that tracked the arrival of correspondence and preserved files of other documentary records, such as annual corporate reports and "Lipman Reports" (an internal Company newsletter). Overman Aff. at ¶12; Ex. J at PL0000013-14.

39. Further, the Plaintiff was responsible for scanning newly-acquired business cards (for example, from clients, prospective clients, and professional colleagues) into the Company's Memphis business-contacts directory (referred to as the "Cardex"). Overman Aff. at ¶12; Ex. J at PL0000017.

40. In addition, the Plaintiff also routinely oversaw purchasing on Mr. Lipman's behalf (some of it business-related and some personal), primarily placing book orders but also acquiring other materials as directed by Mr. Lipman or Barbara Goff (another assistant to Mr. Lipman) at Guardsmark's Memphis headquarters. Pursuant to these purchasing duties the Plaintiff was required to send receipts to the Memphis office for payment, and filing copies of all purchasing receipts. Ex. J at PL0000017.

**Duties at the Rockefeller Center**

41. Once at the Rockefeller Center the Plaintiff continued to fulfill a number of duties that permitted Mr. Lipman to carry out his managerial responsibilities. As at Mr. Lipman's residence, the Plaintiff logged all of the correspondence received for Mr. Lipman, and presented the log to Mr. Lipman (as well as copying the Memphis office to the mail log). Ex. J at PL0000022-PL0000025.

42. The Plaintiff also sorted the correspondence itself into color-coded folders based upon the substance of the correspondence, and presented the folders to Mr. Lipman. Overman Aff. at ¶¶15-17; Ex. J at PL0000022-PL0000023. The Plaintiff was responsible for identifying specific pieces of correspondence that required a response from Mr. Lipman, for presentation to him. Id.

43. Likewise, the Plaintiff was responsible for dealing with telephone calls that came into the office for Mr. Lipman, including (1) logging all incoming calls; (2) advising Mr. Lipman of "important" calls—including interrupting Mr. Lipman, if necessary; (3) preparing lists of unreturned

calls; and designating specific calls for forwarding to other departments, such as forwarding certain calls from political offices to Guardsmark General Counsel Gary Leviton.  Ex. J at PL0000025-PL0000026.

44. Among the calls that the Plaintiff fielded were "calls for time," or requests from within Guardsmark itself for time to discuss an issue with Mr. Lipman.  Even at the highest executive levels of Guardsmark, corporate officers are unable to directly dial Mr. Lipman for questions or discussion.  Overman Aff. at ¶13; Leviton Aff. at ¶5.

45. Instead, all such requests for such discussion were routed through the Plaintiff, who presented Mr. Lipman with these "calls for time" in summarized formats characterized as "pink notes" (as opposed to "white notes" used for passing information to Mr. Lipman during meetings).  Overman Aff. at ¶13; Leviton Aff. at ¶5.

46. The Plaintiff's daily duties extended beyond the handling of correspondence and communications and included the maintenance of various calendars around the office, including the personal calendar kept by Mr. Lipman in his office; the desk calendar for her office-mate, Karolina St. John; and conference room calendar.  Ex. J at PL0000019.  The Plaintiff also maintained the "Cardex" while in the office by checking the daily obituaries for the deaths of Guardsmark contacts who were included in the "Cardex."  Id. at PL0000020.

47. On a daily basis, the Plaintiff also checked the dictation unit in the office for dictation left by Mr. Lipman; and typed and filed any dictation as needed.  Ex. J at PL0000017-PL0000018.

48. The Plaintiff was also responsible on a daily basis for the sorting of non-correspondence materials into presentation folders to be provided to Mr. Lipman; among these materials were Mr. Lipman's daily schedule and lists of Guardsmark personnel who were scheduled to be in the Rockefeller Center office that day.  Ex. J at PL0000020-PL0000024.

49. The Plaintiff also assembled "Daily Folders" and "Black Bag Lists" for Mr. Lipman, consisting, respectively, of: a daily package of materials including scheduling information, logs of calls and informational notes, and news and magazines to accompany Mr. Lipman back to his residence; and a weekly packet of items for Mr. Lipman's review and signature over the weekend. Ex. J at PL0000029-PL0000031.

50. Mr. Lipman relied on the Plaintiff to identify, sort, and prepare all of these critical material properly in order to permit him to remain aware of what was happening within his company, so as to make appropriate managerial determinations; and to allow him to execute his leadership responsibilities. Overman Aff. at ¶¶14-23.

51. The Plaintiff also prepared Mr. Lipman's conference rooms for him, in particular for the commencement and execution of a once-monthly three-day status meeting known at Guardsmark as the "President's Meeting." Ex. J at PL0000036-PL0000037.

52. The Plaintiff prepared materials for these meetings, such as collecting together each Meeting's daily agendas and a list of travel schedules of personnel attending the Meeting; and updating these travel schedules as needed during the Meeting. Ex. J at PL0000036-PL0000037.

53. The Plaintiff was further responsible for the maintenance and operation of the Video-Conferencing unit employed by Mr. Lipman not only during President's Meetings, but in the course of his normal conduct of meetings (including setting up and shutting down the unit). Ex. J at PL0000021, PL0000038.

54. The Plaintiff's execution of her duties related directly to the management of the company, by rendering direct assistance to the individual whose function is to provide the company with its leadership and direction and the source of (or source of approval for) all executive-level decision-making at Guardsmark. Leviton Aff. at ¶¶6-7.

HARRIS BEACH PLLC
ATTORNEYS AT LAW

12

55. The Plaintiff's duties in handling correspondence and telephone calls, for example, rendered her a "gatekeeper" to the President, an individual whose responsibility for operating an international corporation meant that the use of his time had to be budgeted for maximum efficiency. Overman Aff. at ¶¶14-24.

56. The Plaintiff was routinely called upon to assess with little or no guidance whether or not a telephone call, piece of correspondence, or request for a meeting with the President truly merited Mr. Lipman's time and attention. Overman Aff. at ¶¶15-18.

57. In making these assessments, the Plaintiff effectively determined who gained access to Guardsmark's head, because if the Plaintiff determined that Mr. Lipman was not the appropriate recipient of a particular communication, she would redirect it to a more appropriate recipient. Overman Aff. at ¶¶14-23.

58. For example, the Plaintiff routed legal matters and calls from political staff to the attention of the General Counsel, rather than sending these directly to Mr. Lipman himself. Leviton Aff. at ¶¶6-7; Ex. J at PL0000025-PL0000026.

59. Because the President of the company is also continuously bombarded with large amounts of information that cannot all be responded to without compromising the effective management of the company, the Plaintiff's identification, sorting, and categorization of materials for presentation to Mr. Lipman during the course of the day served to distill this information down into a manageable volume and permitted him to make use of and respond to this information. Overman Aff. at ¶¶14-20, 23.

60. Without this information, Mr. Lipman could not have engaged in the hands-on management with which he directed the actions of his company. Overman Aff. at ¶¶26-27. Indeed, Mr. Lipman frequently and regularly relied on the Plaintiff's discretion as to assessing the relative

importance of this information, by approaching the Plaintiff during the day and asking her what he needed to know or respond to immediately.  Id. at ¶23.

61.     Moreover, in the course of performing all of her duties, the Plaintiff was exposed to some of the most confidential and proprietary information that passed through the company, including the company's internal financial data and price books used in marketing and arranging the provision of the company's services.  Overman Aff. at ¶¶21-22.  The Plaintiff was expected to handle all of this information with the degree of security and confidentiality required.  Id.

**THE END OF THE PLAINTIFF'S EMPLOYMENT; PROCEDURAL BACKGROUND**

62.     The Plaintiff's last day of work at Guardsmark was July 29, 2011, at which point she commenced an absence which, on or about August 3, 2011, her husband characterized to Guardsmark as medical in nature.  Leviton Aff. at ¶8; Martin Aff. at 11.

63.     The Plaintiff continued to be paid her salary through approximately September 5, 2011, at which point she contacted Guardsmark by phone to resign verbally, advising that she "would not be returning" to her position.  Martin Aff. at ¶13; Leviton Aff. at ¶9.

64.     The company continued to provide the Plaintiff with health insurance coverage through September 30, 2011.  Martin Aff. at ¶14.  The next communication from the Plaintiff following this date was the receipt of correspondence from her attorney demanding compensation for allegedly unpaid overtime wages.  Leviton Aff. at ¶11.

65.     The Plaintiff subsequently filed her Complaint in June of 2012 alleging, *inter alia*, failure to pay overtime for hours worked in excess of forty per week pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §201 *et seq.*; the New York State Minimum Wage Act, N.Y. LAB. LAW §650 *et seq.*; and breach of contract in violation of the common law of New York State. See generally Ex. I.

66. The Defendants timely filed an Answer to the Plaintiff's Complaint denying those facts relating to the substantive elements of the Plaintiff's claims; and asserting a series of affirmative defenses including, *inter alia*, the Plaintiff's status as a salaried "exempt" employee under the FLSA. (The Defendants' Answer to the Plaintiff's Complaint, dated July 11, 2012, is annexed hereto as **Exhibit K.**)

67. The parties have exchanged documentary and interrogatory discovery pursuant to Federal Rules of Civil Procedure 33 and 34; in addition to informal discovery, including damages estimates provided by the Plaintiff, exchanged in advance of a settlement conference held in October of 2012.

68. The end of the factual discovery period (previously extended for two months by order of the Court) occurred on January 31, 2013.

69. The parties have exchanged sufficient information as this time to permit the Defendants to demonstrate that there is no material issue of fact with respect to the Plaintiff's ability to satisfy all of the requisite elements of the "highly compensated employee" exemption under the FLSA and the requirement of using the fluctuating work week method to calculate overtime, and accordingly move for summary judgment with respect to the Plaintiff's claims on these bases.

Dated: February 26, 2013
Pittsford, New York                    **HARRIS BEACH PLLC**

                                       By:      s/ Scott D. Piper
                                            Scott D. Piper
                                            *Attorneys for Defendants*
                                            99 Garnsey Road
                                            Pittsford, New York 14534
                                            Telephone: (585) 419-8800
                                            E-Mail: spiper@harrisbeach.com

TO:   Steven Moser, Esq.
      *Attorneys for Plaintiff*
      1 School Street, Suite 303
      Glen Cove, NY 11542
      (516) 671-1150
      (516) 882-5420 (fax)
      sjm@stevenjmoser.com

248408 1569940v1